**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jan 09 2012, 9:08 am

CLERK
of the supreme court,
court of appeals and
tax court

APPELLANT PRO SE:

**KURT H. GREGORY**
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

KURT GREGORY,              )
                      )
    Appellant-Respondent,   )
                      )
        vs.           )    No. 02A04-1105-DR-256
                      )
CAROL GREGORY,          )
                      )
    Appellee-Petitioner.     )

APPEAL FROM THE ALLEN CIRCUIT COURT
The Honorable Thomas J. Felts, Judge
Cause No. 02C01-0807-DR-574

**January 9, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BARNES, Judge**

**Case Summary**

Kurt Gregory appeals a post-dissolution order issued by the trial court addressing contempt petitions he filed against his ex-wife, Carol Gregory, and a contempt petition that Carol filed against Kurt. We affirm in part, reverse in part, and remand.

**Issues**

The restated issues before us are:

I.      whether the trial court properly denied Kurt's original contempt petition;

II.     whether the trial court properly ordered Kurt to pay a private school registration fee for the parties' children;

III.    whether the trial court properly ordered the parties to participate in a parental counseling program; and

IV.    whether the trial court properly ordered that Kurt's two amended contempt petitions be submitted to arbitration.

**Facts**

Kurt and Carol were married from 1988 until they divorced in June 2009. They had two children during the marriage, born in 1997 and 1998. The parties resolved their property settlement and child custody issues through a mediated settlement agreement ("MSA") that the trial court approved and incorporated into the dissolution decree. Regarding child custody, the MSA provided in part that Carol was granted primary physical custody of the children, with Kurt having "specific custodial periods with the minor children as agreed to by and between the parties and at a minimum according to

2

the Indiana Parenting Time Guidelines." App. p. 5. The parties also agreed that visitation "shall be determined by agreement of Wife and Husband taking into consideration the wishes of their children and said children's school and extracurricular activities." Id. The MSA also stated that each party should keep the other advised of their phone numbers "and their whereabouts on vacations with said children," and further provided, "Each party shall be entitled to speak to the children by telephone at reasonable times and intervals when the children are physically with, or subject to control of the other party." Id. at 6. Finally, the MSA contained the following provision concerning arbitration:

> While the parties are in some disagreement regarding the ability to jointly decide future issues, they desire to formulate a framework to avoid impasse, and therefore agree that any disagreement regarding the children shall be submitted to arbitration before filing any court petition, and the prevailing party at arbitration shall be entitled to recover their attorney's fees and the costs of arbitration.
> The preceding paragraph shall not in any way preclude either party from seeking a Court modification of this provision, nor shall it preclude either party from seeking Court assistance in the interpretation of this legal joint custody agreement, or enforcement of any of the provisions contained therein.

Id. at 6-7.

On October 27, 2009, Kurt filed a "Verified Petition for Rule to Show Cause." Id. at 21.[1] The petition alleged that Carol was in contempt for several reasons, including that she was unilaterally changing exchange arrangements for the children; that she did not

---

[1] The parties were represented by counsel during the initial dissolution proceedings, but since then have represented themselves throughout the numerous filings and hearings in this matter, including this appeal.

3

allow Kurt the opportunity to have additional parenting time when she was working or otherwise not caring for the children herself; that she bought cell phones for the children and used them to call the children during Kurt's parenting time and also that the children did not always return Kurt's phone calls to the cell phones in a timely fashion; that she used "telephonic communications with the children to spy" on him; that she did not always pack school clothes and items when the children came for parenting time; and that she took the children out-of-state without providing an itinerary or emergency contact information. Id. at 21-23. This contempt petition initially was referred to out-of-court mediation, but on January 14, 2010, the mediator reported to the trial court that the parties were unable to reach any agreement regarding the allegations in the petition.

On August 23, 2010, Carol filed a "Verified Motion for Contempt" against Kurt for allegedly failing to pay his share of tuition at a private school where the parties had agreed the children would attend. Id. at 31. The record is slightly confusing on this point, but it appears the trial court originally scheduled a hearing on both pending contempt petitions for February 16, 2011, which was rescheduled to October 25, 2010 at Carol's request, but which was later rescheduled again to February 16, 2011. The trial court did conduct a case management conference on October 25, 2010, to discuss the pending contempt petitions, and determined that a ninety-minute hearing would be sufficient to address those motions.

On December 30, 2010, Kurt filed two motions "To Amend Respondent's Motion to Show Cause." Id. at 45, 49. The motions alleged impropriety by Carol in scheduling

4

vacation time with the children that would require Kurt to have make-up time, and again in failing to ensure telephonic communication with the children, and also with respect to allegedly failing to timely return the children to him on October 30, 2010. On January 10, 2011, Carol filed an objection to Kurt's amended contempt motions, requesting that they be submitted to arbitration per the MSA. On that same date, Carol also filed a "Motion for Injuntive [sic] Relief," requesting arbitration of whether the parties' children should continue in private school or move into the public school system. Id. at 53.

The trial court conducted a ninety-minute hearing between the parties on February 16, 2011. During the hearing, Kurt conceded that he owed over $1000 toward the children's private school education for the 2009-10 school year. However, he claimed that he was entitled to be reimbursed $150 for paying the registration fee for the 2010-11 school year; he also sought to be reimbursed $90 for having to spend an hour away from his business practice to register the children for the 2010-11 school year. Kurt also consented to arbitration of the question of where the children should attend school in the future. The court reiterated that it had not allotted time to consider matters filed after the October 25, 2010 case management conference, including Kurt's amended contempt petitions, and declined to hear evidence on those matters.

On March 10, 2011, the trial court entered an order denying Kurt's original contempt petition. It also directed that the parties enroll in a program called "Always a Parent" and ordered each party to pay "their portion of any costs of this program." Id. at 58-59. It ordered Kurt to pay the tuition that he still owed for the 2009-10 school year

5

and stated that he was "responsible for the registration fee" at the school, which resulted in a total payment of $1311.82; the court did not explicitly mention the $90 Kurt was seeking, nor did it hold him in contempt for not paying the tuition earlier. With respect to Kurt's amended contempt petitions and Carol's motion for injunctive relief, the trial court scheduled arbitration to be held on those matters on June 10, 2011. Kurt filed a motion to correct error, which the trial court denied. Kurt now appeals.

**Analysis**

Carol has not filed an appellee's brief. Because of this, we may reverse if Kurt establishes prima facie error, which is "error at first sight, on first appearance, or on the face of it." See Willis v. State, 907 N.E.2d 541, 544 (Ind. Ct. App. 2009). This rule is not for the appellant's benefit, but to relieve this court of the burden of controverting the appellant's arguments. Id. "We are not relieved, however, of our obligation to properly decide the law as applied to the facts of the case." Id. at 544-45.

*I. Denial of Original Contempt Petition*

We first address Kurt's contention that the trial court erred in denying his original contempt petition against Carol. Contempt of court is disobedience of a court that undermines the court's authority, justice, and dignity. Henderson v. Henderson, 919 N.E.2d 1207, 1210 (Ind. Ct. App. 2010). This case involves alleged indirect contempt, which includes willful disobedience of any lawfully entered court order of which the offender had notice. Id. Specifically, Kurt contends Carol willfully disobeyed provisions

6

of the Indiana Parenting Time Guidelines ("PTG") and the MSA regarding parenting time.[2]

Determination of whether a party is in contempt of court is a matter within the trial court's discretion. Van Wieren v. Van Wieren, 858 N.E.2d 216, 222 (Ind. Ct. App. 2006). We will reverse a ruling on a contempt petition only for an abuse of discretion. Id. at 223. "A trial court abuses its discretion when its decision is against the logic and effect of the facts and circumstances before the court or is contrary to law." Id. We will neither reweigh the evidence nor judge the credibility of witnesses when reviewing a contempt ruling. Id. Moreover, the overarching principle in this case is that we grant latitude and deference to trial courts in family matters. Heagy v. Kean, 864 N.E.2d 383, 388 (Ind. Ct. App. 2007), trans. denied.

Kurt argues in part that the trial court erred as a matter of law in declining to find Carol in contempt, because in its order the court referred to the general purposes behind the PTG derived from the Preamble to the PTG. The trial court specifically stated, after denying Kurt's original contempt petition:

> The Court notes that the purpose of the Indiana Parenting Time Guidelines is to provide a model which may be adjusted. Parents should be flexible and create a parenting time agreement which addresses the unique needs of the children and the circumstances. They are not meant to foreclose the Court from granting such additional or reduced parenting time as may be reasonable in any given case. In addressing all parenting time issues, both parents should exercise sensibility, flexibility and reasonableness. The

[2] The MSA itself provided few concrete provisions regarding parenting time, except that the PTG were to provide the minimum standards.

7

guidelines assume that the parents are respectful or each other
and will cooperate with each other.

App. p. 58.

We find nothing wrong with the trial court making these observations and statements in its order.[3] They clearly were meant to encourage the parties, who have a very acrimonious relationship at this point, to cooperate and communicate better for the sake of their children. Additionally, there is nothing inappropriate in a trial court considering the general purposes and principles behind the PTG in deciding whether a parent should be held in contempt for allegedly violating the PTG. In other words, a trial court reasonably could conclude that granting contempt petitions for every single possible technical violation of the PTG would do nothing to further the best interests of the children, as opposed to merely increasing acrimony between the parties and discouraging the parties from working out differences between themselves. See Kicken v. Kicken, 798 N.E.2d 529, 534 (Ind. Ct. App. 2003) (affirming trial court's refusal to hold either parent in contempt for alleged parenting time violations where trial court had stated, "It's like me saying to you, you're wrong which is of course a victory for you and . . . for you to say ha, ha, I was right. I don't want to do that to you or her.").

Turning to Kurt's specific claims against Carol, he first contends that she violated the PTG and MSA by unilaterally changing arrangements for the transfer of the children

---

[3] Kurt also contends that because the trial court made these statements, its order contained findings of fact and conclusions thereon. We disagree. The order contains no factual findings, and we will review it as a general judgment. Such a judgment may be affirmed on any legal theory consistent with the evidence. Boetsma v. Boetsma, 768 N.E.2d 1016, 1019 (Ind. Ct. App. 2002), trans. denied.

8

for his parenting time. Kurt presented evidence of such changes on three dates in 2009 and claims they resulted in twenty additional minutes of travel time on each occasion. He claims that such action violated Section I(C)(1) of the PTG, which states in part, "Parenting time is both a right and a responsibility, and scheduled parenting time shall occur as planned." Although it could be argued that Carol's actions were not entirely in keeping with the spirit of the PTG, we simply cannot perceive that they substantially interfered with Kurt's parenting time. Moreover, neither the PTG nor the MSA contain any explicit provisions about how, when, and where the transfer of children for parenting time should occur. The trial court was under no obligation to hold Carol in contempt for these actions.

Second, Kurt argues that Carol improperly failed to offer additional parenting time to him at times when she was unable to care for the children or otherwise was not directly caring for them. He cites Section I(C)(3) of the PTG, which states in part, "When it becomes necessary that a child be cared for by a person other than a parent or a family member, the parent needing the child care shall first offer the other parent the opportunity for additional parenting time." Based on Kurt's own testimony, the evidence was that Carol utilized her mother—the children's grandmother—for child care purposes. Kurt failed to present any evidence that persons other than family members provided child care for the children.

The PTG states that when a custodial parent utilizes additional child care provided by a "family member," then the parent needing the child care has no obligation to offer

9

parenting time to the other parent. The plain language of this guideline arguably would encompass a grandparent. There is, however, caselaw interpreting this particular provision to mean that the "family member" must reside in the custodial parent's household. See Shelton v. Shelton, 835 N.E.2d 513, 517 (Ind. Ct. App. 2005), summarily aff'd by Shelton v. Shelton, 840 N.E.2d 835 (Ind. 2006). Regardless, there is no evidence that Carol was aware of this appellate interpretation of the PTG when she regularly utilized her mother to care for the children without first giving Kurt the option of providing additional child care. Kurt has not established that Carol willfully disobeyed the MSA or PTG on this point. In any event, Carol provided evidence that she had offered additional parenting time to Kurt when she needed child care on a number of occasions.

Third, Kurt contends Carol violated PTG Section I(A)(3), which states in part:

> Both parents shall have reasonable phone access to their child at all times. Telephone communications with the child by either parent to the residence where the child is located shall be conducted at reasonable hours, shall be of reasonable duration, and at reasonable intervals, without interference from the other parent.

Our review of the available evidence is that, indeed, there was considerable disagreement between Kurt and Carol as to what constituted "reasonable" phone contact with the children. Without any more concrete guidelines in either the PTG or the MSA, however, we decline to say that such disagreements would justify finding Carol in contempt of court.

10

Kurt also suggests Carol did not sufficiently encourage the children to return his calls and communicate with him; Carol testified that the children often were reluctant to return calls and the like. Undoubtedly, divorced parents have an obligation to encourage their children to cooperate and communicate with the other parent. See Ind. Parenting Time G. I(E)(3); MacIntosh v. MacIntosh, 749 N.E.2d 626, 630 (Ind. Ct. App. 2001), trans. denied. Whether a parent should be held in contempt for failing to ensure that a child cooperates and communicates with the other parent, however, is necessarily a highly discretionary and fact-sensitive determination. The trial court declined to find Carol's conduct contemptuous on this point, and we will not second-guess that determination.

Fourth and finally, Kurt argues that Carol violated Section I(A)(5) of the PTG, which states:

> For emergency notification purposes, whenever a child travels out of the area with either parent, one of the following shall be provided to the other parent: An itinerary of travel dates, destinations, and places where the child or the traveling parent can be reached, or the name and telephone number of an available third person who knows where the child or parent may be located.

Kurt presented evidence of three claimed occasions when Carol took either one child or both children out of Indiana for varying lengths of time without providing a detailed itinerary or emergency contact information. Carol responded generally to this evidence that she did in fact provide advance notice of dates when she and the children would be out-of-state and that, in any event, she and the children always had their cell phones and

11

could have been contacted by Kurt through them in the event of an emergency. Nevertheless, Kurt is insisting that the precise letter of PTG Section I(A)(5) must be complied with, and Carol failed to do so.

Even if we were to assume Carol did not strictly comply with the letter of Section I(A)(5), she and the children could have been contacted at any time by Kurt through their cell phones. This sufficiently complied with the spirit of the rule. Additionally, Kurt makes no claim that he was unable to contact the children regarding an emergency when Carol had taken them out-of-state. The stated purpose of Section I(A)(5) is for "emergency notification." We do not believe it was intended to impose unnecessary burdens upon traveling parents. Also, the rule was adopted in 2000. Since then, cell phone usage has become much more ubiquitous, meaning that most persons can be contacted through their phone, by call or text, at most times and in most places.[4] Certainly, it is much more convenient to attempt to contact a person directly through a cell phone than indirectly through a hotel or other place where a person may be staying while traveling.

In sum, Kurt has failed to identify anything more than, at the most, minimal instances when Carol's conduct could be seen as technically violating the PTG and MSA, although for the most part the evidence most favorable to the trial court's ruling is that no

---

[4] According to statistics from CTIA, a wireless communication advocacy group, there were 118.4 million cell phone subscribers in the United States and its territories in June 2001, representing 40.9% of the country's population. By June 2011, that number had grown to 322.9 million, representing 102.4% of the country's population. See http://www.ctia.org/advocacy/research/index.cfm/aid/10323 (last visited Nov. 29, 2011).

such conduct occurred, or that it was not willful misconduct. The trial court did not abuse its discretion in refusing to hold Carol in contempt under Kurt's original petition.

## II. School Registration Fee

We next address Kurt's argument that the trial court erred in ordering him to pay the $150 school registration fee for his children for the 2010-11 school year, and also in denying his request for $90 from Carol.[5] These issues are linked to Carol's request that Kurt pay his thirty percent share of the tuition for the 2009-10 school year, as the MSA required him to do. Carol presented evidence that the amount of tuition Kurt had failed to pay was $1311.82 or $1311.80; there is a two cent difference in some of the evidence. However, Carol stated, both in her testimony and in prior communications with Kurt, that she was willing to credit him the $150 registration fee he paid in March 2010 against the tuition he still owed. Ultimately, at the conclusion of the hearing, Carol requested that Kurt be ordered to pay $1161.80 in tuition owed for the 2009-10 school year, which is $1311.80 minus $150. Thus, given that Carol had agreed, both in and out of court, that Kurt should be reimbursed the $150 registration fee, we conclude that Kurt has established prima facie error in the trial court's ordering him to pay that fee. We reverse the award of $1311.82 in tuition owed by Kurt and remand for that award to be reduced to $1161.80.

---

[5] Although Kurt claims the trial court's order is unclear, we believe it intended to require Kurt to be responsible for the registration fee for the children's 2010-11 school year only, which he had already paid, and that it rejected his request for $90 from Carol, even if it did not explicitly mention that request.

Regarding the $90, Kurt claims he was owed this money because he was compelled to cancel an appointment at his place of business at the last minute, for which he charges a $90 hourly rate, in order to go to the private school to register the children for the 2010-11 school year. He contends that he registered them at the last possible minute in March 2010 after Carol had failed to carry out her obligation to do so. Carol, however, testified that she had not yet registered the children at the private school because she wanted to discuss the possibility of enrolling the children in public school instead, but Kurt refused to discuss it with her at all. Moreover, she contended Kurt overreacted in paying the registration fee when he did, because the absolute deadline for registering the children at the private school was sometime in July, not March. Under these circumstances, we cannot say the trial court was compelled to order Carol to reimburse this $90 to Kurt.

### III.  Parental Counseling Program

Next, Kurt argues the trial court's order is erroneous with respect to ordering the parties to participate in a "program entitled 'Always a Parent,' administered by Family Connections." App. p. 58. The trial court had hinted at the hearing that it was displeased with how the parties were addressing issues involving their children and said, "I'm very tempted to order both of you to parenting classes." Tr. p. 69. We assume the "Always a Parent" program is a parenting class of some kind, although no further information about it is in the record before us.

14

Kurt does not challenge the trial court's ordering him and Carol to participate in this program but does challenge that part of the order stating, "Each party is responsible for their portion of any costs of this program." App. pp. 58-59. Kurt directs us to Indiana Code Section 33-23-6-2, which governs funds for trial court domestic relations alternative dispute resolution programs throughout the state. Specifically, subsection (d) of the statute provides:

> The funds shall be used to foster domestic relations alternative dispute resolution, including:
>
> (1)     mediation;
>
> (2)     reconciliation;
>
> (3)     nonbinding arbitration; and
>
> (4)     parental counseling.
>
> Litigants referred by the court to services covered by the fund shall make a copayment for the services in an amount determined by the court based on the litigants' ability to pay. The fund shall be administered by the circuit, superior, or probate court that exercises jurisdiction over domestic relations and paternity cases in the county. . . .

Ind. Code § 33-23-6-2(d).

Kurt contends that under this statute, the trial court erred in entering an open-ended order for the parties to pay for the cost of the "Always a Parent" program without determining their ability to pay for it and assessing a set copayment for the program. Because we lack sufficient information about the "Always a Parent" program, we cannot definitively answer whether it is a program covered under Section 33-23-6-2. However,

based on the prima facie error rule, the trial court on remand should determine whether this program is a "parental counseling" program that is covered by Section 33-23-6-2 and, if so, to assess a specific copayment for the parties to attend the program based on their ability to pay, in accordance with subsection (d) of the statute.

## IV. *Arbitration*

The last issue we address is whether the trial court erred in ordering Kurt's amended petitions for contempt against Carol to be submitted to arbitration.[6] The Family Law Arbitration Act ("FLAA") permits a wide range of issues in family matters to be submitted to arbitration, including dissolution actions in their entirety, actions to establish child support, custody, or parenting time, or petitions to modify any decree, judgment, or order entered under Indiana Code Title 31. Brockmann v. Brockmann, 938 N.E.2d 831, 835 (Ind. Ct. App. 2010) (citing I.C. § 34–57–5–2(a)), trans. denied. A party seeking to compel arbitration of a dispute has the burden of demonstrating the existence of an enforceable arbitration agreement that applies to the dispute. Id. at 834. "We apply ordinary contract interpretation principles when determining whether the parties have agreed to arbitrate a dispute." Id. Generally, any doubts in interpretation are resolved in favor of arbitration, and parties are required to arbitrate all matters, not explicitly excluded, that reasonably fit within the language of the agreement. Id. However, parties are only bound to arbitrate those issues that by clear language they have agreed to

---

[6] Although the trial court's order only references one amended contempt petition filed on December 30, 2010, Kurt actually filed two such petitions on that date. We believe it is clear the trial court intended for both petitions to be submitted to arbitration.

16

arbitrate, and arbitration agreements will not be extended by construction or implication to cover any other matters. Id. Our ultimate goal when interpreting an arbitration provision is to determine the parties' intent in drafting it, and to effectuate that intent. Id. at 835.

In Brockmann, based on the particular language of the arbitration agreement at issue, the facts and circumstances of the case, and the language of the FLAA, we concluded that the agreement only contemplated arbitration of one specific issue, and not "to any dispute that might arise between the parties for an indefinite period of time." Id. at 836-37. We observed generally that the legislative intent behind the FLAA seemed to contemplate that family law arbitration agreements "address specific disputed issues, rather than permitting open-ended agreements to encompass any future issues that may arise between the parties, unless of course the agreement clearly states to the contrary." Id. (emphasis added).

Here, in fact, the arbitration provision in the MSA states that the parties "desire[d] to formulate a framework to avoid impasse, and therefore agree that any disagreement regarding the children shall be submitted to arbitration before filing any court petition . . . ." App. p. 6. This arbitration provision is of the type we hinted at in Brockmann. Namely, it is an open-ended provision that clearly contemplates the submission of any future disagreements between the parties regarding their children to arbitration. Moreover, Kurt's amended contempt petitions allege "disagreement[s] regarding the children," to use the language of the MSA's arbitration provision. Id. The first such

17

petition alleges miscommunications and the like regarding another vacation by Carol and the children and the children's cell phones, and the second petition seems to allege Carol returned the children to him one hour later than required on October 30, 2010. These disputes appear to be precisely the type of matters the parties intended to be covered by the arbitration provision, and that in fact would be well-suited to being submitted to arbitration and being worked out by the parties in a more expeditious and informal manner than would be the case with a full court hearing.

Despite the first paragraph of the MSA's arbitration provision, Kurt contends that his amended contempt petitions must be heard by the trial court because of the second paragraph of that provision, which states in part that the arbitration requirement "shall not in any way preclude either party . . . from seeking . . . enforcement of any of the provisions" of the parties' custody agreement. App. p. 6-7. A contempt petition is, admittedly, a motion seeking enforcement of a court order.

We note, however, that the language of this paragraph does not obligate the trial court to rule on any contempt petition that one of the parties might file with it; it only permits the filing of such petitions. We believe that the language of the MSA is such that the trial court may fairly look beyond the caption of a motion filed before it and decide, in its discretion, that the substance of the motion would be more appropriately resolved by arbitration. Here, Kurt's amended contempt petitions appear to be based on the same problems of mistrust and miscommunication between the parties that formed the basis of his original contempt petition. Some of those issues may be resolved by the

18

implementation of more concrete standards regarding things such as vacations, phone communications with the children, and exchange of the children for parenting time that are now left vague by both the MSA and PTG. This would represent a modification of the MSA and dissolution decree, thus falling within the ambit of the FLAA, and we cannot say the trial court erred in referring Kurt's amended contempt petitions to arbitration.[7]

However, as Kurt notes, the trial court's arbitration order does not comply with the FLAA's provision regarding the selection of an arbitrator. Indiana Code Section 34-57-5-2(d) states that if the parties to a family law arbitration agreement have not selected an arbitrator as part of the agreement, then the trial court shall designate three attorneys from a list of qualified family law arbitrators, and "[t]he party initiating the action shall strike one (1) attorney, the other party shall strike one (1) attorney, and the remaining attorney is the family law arbitrator for the parties." Here, the parties did not select an arbitrator as part of the MSA, nor did the trial court's order provide a list of three potential arbitrators from which the parties could choose. Although this may appear to be a relatively technical oversight, we have no response from Carol indicating why this provision did not have to be followed. Applying the prima facie error rule, we conclude

---

[7] Kurt also contends that the trial court's referral of his amended contempt petitions to arbitration after conclusion of the February 16, 2011 hearing violated Allen County Family Law Local Rule 02-TR73-723, which states that if the parties are unable to complete a hearing with the scheduled time, "the hearing will be continued and reset on the calendar, unless otherwise directed by the Court." Here, the trial court "otherwise directed" that Kurt's amended contempt petitions should be referred to arbitration and not rescheduled for a future court date.

that the trial court's failure to follow the FLAA's procedure regarding appointment of an arbitrator necessitates remand for that procedure to be followed.

## Conclusion

The trial court did not err in denying Kurt's original contempt petition against Carol or in ordering that his subsequent amended contempt petitions be submitted to arbitration. It also did not err in declining to credit $90 against the amount of outstanding tuition that he owed for the children's schooling. It did, however, err in not crediting the $150 registration fee, which Carol agreed should occur, and we reverse and remand for the tuition award to be reduced by that amount. We also remand for the trial court to comply with the FLAA's arbitrator selection process for arbitration of Kurt's amended contempt petitions, as well as the question of where the children should attend school.[8] Additionally, on remand the trial court should assess a copayment based on the parties' ability to pay for the "Always a Parent" program, if in fact that program is covered by Allen County's alternative dispute resolution fund.

Affirmed in part, reversed in part, and remanded.

KIRSCH, J., and BRADFORD, J., concur.

---

[8] We recognize that arbitration on Kurt's amended contempt petitions, as well as the question of where the children would attend school, were to have taken place in June 2011. The trial court denied Kurt's motion to stay pending this appeal. We do not know the resolution of that arbitration, if it did in fact take place. If it did take place, the result of the arbitration should remain intact until such time as the FLAA procedures are followed and a new arbitration takes place.